Josh A. Cohen (SBN 217853)
CLARENCE DYER & COHEN LLP
899 Ellis Street
San Francisco, CA 94109
Tel: (415) 749-1800
Fax: (415) 749-1694
jcohen@clarencedyer.com

Attorney for Defendant LUIS HERRERA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>LUIS HERRERA,<br><br>  Defendant. | CASE NO. CR-08-0730 WHA<br><br>**DEFENDANT LUIS HERRERA'S SENTENCING MEMORANDUM**<br><br>Sentencing Date: January 24, 2012 |

## INTRODUCTION

Having accepted full responsibility for his conduct pursuant to a plea agreement reached in the middle of trial, Mr. Herrera comes before this Court prepared to accept a sentence of 35 years in federal prison. This is, by a factor of 175%, the lengthiest sentence agreed to by any defendant in this long and difficult case. By the same token, as Mr. Herrera acknowledged in the first moments of his opening statement at trial, the events that unfolded in Daly City on February 19, 2009 were horrible. Mr. Herrera has agreed to serve 35 years in prison because he recognizes the gravity of the crime and the extent of the injuries it caused.

Yet there are several mitigating factors that distinguish Mr. Herrera from his codefendants. Mr. Herrera was just 18 years old when he drove the car that carried the shooters to and from the scene of the Daly City homicide. He had been a member of MS-13 for barely two months. He had no criminal record prior to his arrest in this case and had no leadership role or managerial responsibilities within the 20th Street clique. Until he joined the organization in December 2008, Mr. Herrera was a good student, a dutiful employee, and a dedicated member of the Pentecostal church. With sincere apologies to the Frias family and the other victims of the offense, Mr. Herrera respectfully submits that a sentence of 35 years in prison is more than sufficient to punish his particular role in the offense while recognizing his lesser role in the broader conspiracy, his otherwise redeeming youth, and his genuine potential for rehabilitation.

## DISCUSSION

**I.    The Court Should Impose A Sentence Sufficient But Not Greater Than Necessary To Serve the Purposes of Sentencing**

Following *United States v. Booker*, 543 U.S. 220 (2005), sentencing courts must sentence in accordance with the factors enumerated in 18 U.S.C. § 3553(a). In particular, a court must fashion a sentence that is "sufficient, but not greater than necessary," to serve the purposes of sentencing set forth in the statute. 18 U.S.C. § 3553(a)(2); *see Kimbrough v. United States*, 522 U.S. 85, 111 (2007) (describing the "sufficient, but not greater than necessary" requirement as the "overarching instruction" of § 3553(a)). As the Supreme Court has explained, "[t]he overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *United States v. Carty*, 520 F.3d 984, 991 (2008) (citing 18 U.S.C. § 3553(a)).

The Sentencing Guidelines are but one factor among many for a court to consider at sentencing. *United States v. Ressam*, 593 F.3d 1095, 1117-18 (9th Cir. 2010). Courts cannot presume that the sentencing range recommended by the Sentencing Guidelines is reasonable or accord more weight to the Guidelines than the other § 3553(a) factors. *Carty*, 520 F.3d at 991.

Rather, a court must make an individualized assessment and fashion a sentence that takes account of the particulars of the offense and the unique characteristics of the offender.  *Ressam*, 593 F.3d at 1117-18.

## II. A Sentence of 35 Years In Federal Prison Is Sufficient But Not Greater Than Necessary for Mr. Herrera

There is no dispute concerning the sentence recommended by the Sentencing Guidelines for Mr. Herrera's offenses of conviction.  The offense level for homicide is 43.  U.S.S.G. § 2A1.1(a).  Because there were multiple victims of the February 19, 2009 incident, and because each victim constitutes a distinct "group" under the Sentencing Guidelines, the total adjusted offense level is 43 even after Mr. Herrera's acceptance of responsibility is taken into account.  PSR ¶¶ 127-31.  At offense level 43, the advisory Guidelines range, regardless of criminal history, is life.

Notwithstanding this advisory sentence, the parties and the probation officer jointly recommend a sentence of 35 years for Mr. Herrera.  There are several reasons the Court should accept this recommendation and impose the agreed-upon sentence of 35 years in prison followed by five years of supervised release.

### A. Mr. Herrera Played A Lesser Role Than His Codefendants In The February 19, 2009 Daly City Homicide

Having presided over the trial of Mr. Herrera and codefendant Danilo Velasquez, the Court is well acquainted with the facts of the Daly City homicide on February 19, 2009.  As the Court knows, Mr. Frias was killed, and Jesus Arjona and Jason Mendieta were seriously injured, when they were mistaken for rival gang members and their car was unexpectedly fired upon by two gunmen at a stoplight outside the Daly City BART station.

As Mr. Herrera has admitted, he drove the vehicle that carried the shooters to and from the scene of the Daly City homicide.  More specifically, the evidence at trial established that Mr. Herrera was directed by other MS members to follow the car in which Mr. Frias and his companions were riding.  When Mr. Herrera pulled up behind that vehicle, the other occupants of

Mr. Herrera's car exited, approached Mr. Frias' vehicle, fired into it from both sides, and then returned to Mr. Herrera's car and left the scene.

The horror of this incident cannot be overstated. Insofar as relative culpability can nonetheless be assigned, however, Mr. Herrera undisputedly played a lesser role in the tragedy. Mr. Herrera did not order the "hunt" on February 19, 2009. He did not identify Mr. Frias and his companions as targets or make the decision to pursue them. He did not orchestrate the pursuit. He did not personally possess a firearm, exit the vehicle when it stopped behind Mr. Frias and his companions, or fire a single round. By all accounts, including his own, Mr. Herrera was the driver, not a shooter, on February 19, 2009.

Although every actor in the tragedy is ultimately responsible for what transpired, the Court can and should consider Mr. Herrera's lesser role in the offense when determining an appropriate sentence. *See United States v. Saeteurn*, 504 F.3d 1175, 1181-82 (9th Cir. 2008) (affirming district court's assessment of "the different roles and culpability that each of the defendants had in [the] case" under § 3553(a)). Given that Mr. Herrera's involvement consisted of driving the car to and from the scene of the crime, a 35-year sentence is sufficient but not greater than necessary to reflect the seriousness of the crime and punish his role in carrying it out.

> **B.** **Mr. Herrera Played A Lesser Role Than His Codefendants In The 20th Street Clique and The Associated RICO Conspiracy**

Count One of the Third Superseding Indictment charged a massive and far-reaching RICO conspiracy that originated in the mid-1990s. Nearly all of Mr. Herrera's codefendants were members of this conspiracy for a period of several years, and many were leaders of the organization at some point in time. Most paid dues, attended meetings, and participated in numerous acts of violence over a span of many years.

By contrast, it is undisputed that Mr. Herrera did not join the conspiracy until the end of 2008. It is likewise agreed that Mr. Herrera never ascended to a leadership role, assumed any shot-calling responsibilities, or directed any acts of violence (or, for that matter, any acts of any kind). For most of the period covered by the RICO conspiracy, Mr. Herrera was a small boy working on his grandfather's farm in El Salvador. Even after he came to the United States in

2005, he was a student, a food-service worker, and a devoted church member until just two short months before Moises Frias was killed.

It is well-settled that a conspiracy defendant is legally responsible for the full scope of the conspiracy, including acts committed before he became a member. *See United States v. Blackmon*, 839 F.2d 900, 908-09 (2d Cir 1988) (holding that "with regard to liability for conspiracy, a defendant may be legally responsible for acts of coconspirators prior to that defendant's entry into the conspiracy"). As a matter of equity, however, it would defy fundamental notions of fairness to sentence Mr. Herrera for acts committed by others years before he joined the organization. *See*, *e.g.*, *United States v. Carreon*, 11 F.3d 1225 (5th Cir. 1994) (holding that a conspiracy defendant must be sentenced for "his individual acts and omissions, not his criminal liability under the substantive law of conspiracy"); *United States v. Petty*, 992 F.2d 887, 890 (9th Cir. 1993) (holding that, under the Guidelines, a conspirator should be sentenced only on the basis of acts that "fell within 'the scope' of his particular agreement with the conspirators"). While the evidence at trial established a number of murders and other violent acts committed by Mr. Herrera's co-defendants – for example, the murders of Ernad Joldic, Philip Ng, Juan Rodriguez, and Armando Estrada – the government has never alleged that Mr. Herrera played a role in the planning or commission of any act prior to 2009.

The Court can and should consider Mr. Herrera's limited role in the conspiracy as an additional factor in favor of the sentence recommended by the parties and the probation officer. As the presentence report correctly notes, Mr. Herrera's lesser role is relevant not only to the Court's assessment of the nature and circumstances of the conspiracy offense to which Mr. Herrera has pled guilty, but also to the Court's assessment of relative culpability. PSR ¶¶ 193-94. Considered in relation to other defendants who participated in the organization as leaders or organizers or for far longer periods of time, Mr. Herrera was a smaller player who deserves a less onerous – though still substantial – sentence.

///

///

### C.  Mr. Herrera Was Eighteen Years Old And Had No Criminal History

When Mr. Herrera joined the 20th Street Clique in December 2008, he was anything but a hardened criminal.  With the exception of an unlicensed driving charge that was dismissed in the interests of justice, PSR ¶ 136, Mr. Herrera had no criminal record at the time of his arrest and no documented history of association with MS-13 or any other criminal organization.  PSR ¶ 135.

Instead, the history of Mr. Herrera's life before MS is one of work, study, and religion.  As set forth in the presentence report, Mr. Herrera was born and raised in a rural part of El Salvador.  PSR ¶ 140.  Having never known his father, Mr. Herrera was raised by his maternal grandparents after his mother emigrated to the United States.  *Id.*  From an early age, Mr. Herrera worked to help support the family by toiling in his grandfather's corn, bean, and watermelon fields.  *Id.* & ¶ 142.

When his grandparents passed away, Mr. Herrera was shuffled among relatives in El Salvador until his mother arranged for his passage to the United States.  PSR ¶ 144.  After an arduous, month-long overland journey, Mr. Herrera arrived in the United States at the age of fifteen and enrolled at Newcomer High School in San Francisco.  PSR ¶ 145.  Over the next three years, Mr. Herrera alternated between advancing his studies and providing financial support for his family.  At one point, having dropped out of school to accept a full-time job as a baker at the Sugarbowl Bakery, Mr. Herrera decided his education was more important and arranged his own admission to the YouthBuild vocational educational program on Treasure Island.  Mr. Herrera has completed all but his last year of high school and will have no difficulty earning his G.E.D. in prison.

In addition to working and studying, Mr. Herrera spent much of the three years preceding his gang membership at church.  Attached hereto as Exhibit A is Mr. Herrera's own handwritten account of his extensive church activities.  As set forth therein, Mr. Herrera's participation in the liturgical and community-based activities of the Pentecostal Church of God developed and intensified until he was attending church six days a week.  This account was confirmed by the probation officer through an interview of Father Pedro Cisneros, who expressed his continued

support for Mr. Herrera. PSR ¶ 146. Exhibit B contains of photographs of Mr. Herrera at church just a few months before he joined MS. As these exhibits make clear, Mr. Herrera was on a very different – and far more virtuous – path until the fateful moment he swerved.

As the PSR explains, Mr. Herrera left the church in December 2008 when he and his girlfriend conceived a child. PSR ¶ 145. This was the single most significant factor in Mr. Herrera's ill-fated decision to join MS-13. Embarrassed by his failure to live up to the example the church had taught him to set, Mr. Herrera abandoned his church family and took up instead with the individuals who soon became his codefendants in this case.

In short, Mr. Herrera was in many ways a model youth until his tragic decision to join the 20th Street clique. While this in no way excuses the conduct that flowed from that decision, it does distinguish Mr. Herrera from many of his codefendants. It also augurs well for Mr. Herrera's future. His work ethic and commitment to the church, coupled with his intelligence and initiative, strongly suggest a capacity for rehabilitation and the ability to contribute meaningfully to society, whether here in the United States or in his native El Salvador.

### D. Mr. Herrera Has Accepted Full Responsibility For His Conduct

There is another significant difference between Mr. Herrera and the defendants whom this Court has sentenced to life: Whereas the other defendants denied responsibility for their conduct, Mr. Herrera has fully admitted his role in the offense.[1] Specifically, Mr. Herrera has acknowledged that he became a member of the 20th Street clique at the end of 2008 and thereby joined the RICO conspiracy; that he participated in the February 19, 2009 homicide of Moises Frias and attempted homicide of Jesus Arjona and Jason and Milton Mendieta; and that he and others were in possession of a firearm at the time of their arrest on March 4, 2009. Notably, Mr. Herrera – and Mr. Herrera alone – admitted to his role in the Frias homicide in the presence of Mr.

---

[1] Although Mr. Herrera did not plead guilty until his trial was underway, he initiated good-faith plea negotiations many months earlier. The protracted nature of the negotiations was not the result of any unwillingness on Mr. Herrera's part to accept responsibility for his misconduct.

Frias' family. This was not a coincidence; Mr. Herrera specifically agreed to allocute in the family's presence to bring them a modicum of closure after three years of wondering exactly what happened to their brother and son.

In sum, Mr. Herrera is quite differently situated from his codefendants who have been or may be sentenced to life in prison. Not only was Mr. Herrera a lesser actor in the tragic events on February 19, 2009, he was a new member of the organization with no leadership role. But for a tragic detour from a far more righteous path as a student, laborer, and committed churchgoer, Mr. Herrera might have avoided this fate altogether.

What is certain is that Mr. Herrera has the capacity, the motivation, and the desire to return to society as a productive wage-earner and father. A sentence of 35 years would reflect the seriousness of the offense, deter similar misconduct, and protect the public while at the same time allowing Mr. Herrera an opportunity for redemption.

## CONCLUSION

For all of these reasons, Mr. Herrera respectfully urges the Court to accept the plea agreement and impose the recommended sentence of 35 years in prison followed by 5 years of supervised release. Mr. Herrera further requests that the Court recommend to the Bureau of Prisons that he be designated to the United States Penitentiary in Atwater, California, or another institution reasonably accessible to the Bay Area to facilitate family visits.

DATED: January 17, 2012          Respectfully submitted,


By  /s/  _____
    Josh A. Cohen
    Attorney for Luis Herrera